**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MENZIES MIDDLE EAST AND AFRICA SA

            Petitioner,

       -against-

REPUBLIC OF NIGER

            Respondent.

Case No. 25-mc-00332-JMF

---

**NOTICE OF PETITIONER'S OBJECTION TO SOLICITING**
**THE VIEWS OF THE UNITED STATES**

Petitioner respectfully submits this objection to the Court's proposal to solicit the views of the United States in this matter. In so doing, Petitioner does not challenge the Court's power to make this request nor that the subject matter of the case is one that implicates foreign and diplomatic relations. The basis of the objection is that the views of the United States are already clear, because binding law compels those views and they are expressed in law, as well as official government websites and United Nations records. Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of what those records say because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, including the government and United Nations websites and databases cited below.

**A. Existing Law and Guidance Makes Clear that the Property is not Immune.**

The Foreign Missions Act states, in relevant part:

§ 4305. Property of foreign missions

(a) Proposed acquisition, sale, or other disposition.
(1) The Secretary shall require any foreign mission, including any mission to an international organization (as defined in section 209(b)(2) [22 USCS § 4309(b)(2)]), to notify the Secretary prior to any

> proposed acquisition, or any proposed sale or other disposition, of any real property by or on behalf of such mission.
>
> (2) For purposes of this section, "acquisition" includes any acquisition or alteration of, or addition to, any real property or any change in the purpose for which real property is used by a foreign mission.

22 U.S.C. § 4305.[1] The Foreign Missions Act further proscribes use by an "unaffiliated alien" of any "any premise of that foreign mission which is inviolable under United States law (including any treaty) for any purpose which is incompatible with its status as a foreign mission, including use as a residence." 22 U.S.C. § 4315. The Office of Foreign Missions guidance is unequivocal that diplomatic premises are to be used for the purpose of carrying out diplomatic functions only; not income-generation to support diplomatic functions:

> Properties acquired by foreign missions for diplomatic or consular purposes are to be used in their entirety for the prescribed purposes. **Property approved for diplomatic or consular purposes may not be used, even in part, for any other purpose, such as** office space for other government organizations, state-owned or private commercial entities, **or renting out to any other party not affiliated with the mission, without the express consent of the Department**.[2]

By using the property to generate money as opposed to housing an ambassador, Niger long ago forfeited the inviolability of the Property under the Vienna Convention on Diplomatic Relations and applicable U.S. law. The United States' view thus conforms to the governing law on the immunity of property owned by a foreign state that is used in a commercial activity in the United States: it is not immune, even if the purpose to which the state directs the proceeds is sovereign. *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).

---

[1] Petitioner attempted to insert hyperlinks to statutes and cases from LexisNexis, but upon testing them, found them inoperable. Petitioner regrets any inconvenience to the Court, and has included links to the authorities from unrestricted online sources where available.
[2] Purchase or Lease of Foreign Mission Property, Office of Foreign Missions, Dep't of State, https://www.state.gov/purchase-or-lease-of-foreign-mission-property, appended hereto as Appendix 1.

Niger assumes without establishing that it is allowed to rent out the Property and preserve its character as a diplomatic premise. That is not right, and the United States has said so. The Office of Foreign Missions requires a notice any time there is going to be a "purchase, lease, resale, alteration, renovation, addition or change in the purpose for which real property is used by a foreign mission," and to include in that notice one of the two following statements:

1.  No part of this property is or will be used for commercial purposes; or
2.  A portion or all of this property is or will be used for commercial purposes **and by doing so the mission understands that such use deprives the area used for such purposes of both its inviolability status** and eligibility for exemption from property taxation.

In his supplemental declaration, Samadou Ousman states that while the property was originally acquired by the Republic of Niger for use by the Nigerien Ambassador to the United Nations, in 1999, "Niger's central government could no longer reliably wire funds to the Mission in New York." Dkt. 38 ¶ 6. He then attests that

> The Ambassador sought and received permission from the central government in Niamey, Niger to vacate the Property and rent it to a third party in order to secure funds that would be used to support the Mission's presence and function in New York City. The central government granted that permission, and, beginning in 2002, the Property was leased for a term of years to the Tenant.[3]

*Id.* ¶ 7. Niger also needed the permission of the United States to do that, because the United States must approve "any change in the purpose for which real property is used by a foreign mission. 22 U.S.C. § 4305(a)(2). Mr. Ousman's declaration is silent as to whether the Nigerien Mission also complied with the Foreign Missions Act, which has been in force since 1982. If Niger has complied with the Foreign Missions Act, then in its notice to the Office of Foreign Missions of the United States, it has already acknowledged that the Property lost its status as a diplomatic building in 2002

---

[3] *Supra*, n. 2.

when it sought and obtained approval of the lease from the Office of Foreign Missions. If Niger did not follow the law, then its failure to do so does not insulate it from the consequences of commercially leasing its property.

**B. The Vienna Convention on Diplomatic Relations Has Never Been Construed by the United States or its Courts to Permit Commercial Leasing of Property Owned by Foreign Sovereigns in the United States**

The United States has never, and could never, agree that foreign states are free to buy up properties in Manhattan, temporarily use them for diplomatic reasons, and rent them out without forfeiting their immunity as diplomatic premises. To so permit would be to overwrite the FSIA entirely, which defines "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act", with the "commercial character [] determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603. And it would virtually guarantee that a significant number of foreign states would soon become landlords in Washington, DC and New York City.

As has been set forth in the briefing, there is no legal precedent allowing a foreign sovereign to enjoy immunity from execution of property used in commercial activities in the United States if that activity generates income for its diplomatic missions. Nothing to the contrary exists in the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 500 U.N.T.S. 95. Article 25 states only that "[t]he receiving State shall accord full facilities for the performance of the functions of the mission." At the time of its drafting, the United States commented that it "agrees that the receiving State should accord appropriate facilities for the performance of the mission's functions. However, there should be some indication as to the meaning and scope of the words 'full facilities.'"[4] In response to this comment,

---

[4] Int'l L. Comm'n, Observations of Governments on the Draft Articles Concerning Diplomatic Intercourse and Immunities Adopted by the International Law Commission at Its Ninth Session in 1957, at 136, U.N. Doc. A/CN.4/114 and Add.1-6 (1958), *available at* https://legal.un.org/ilc/documentation/english/a_cn4_114.pdf, appended hereto as Appendix 2.

the International Law Commission assured parties that "full facilities" was intended to mean help

from the host government in response to reasonable requests:

> Article 23 The receiving State shall accord full facilities for the performance of the mission's functions. Commentary (1) This article, which corresponds to article 19 of the 1957 draft, remains unchanged. (2) A diplomatic mission may often need the assistance of the Government and authorities of the receiving State, in the first place during the installation of the mission, and to an even greater extent in the performance of its functions, for instance in obtaining information, an activity referred to in article 3 (d). The receiving State (which has an interest in the mission being able to perform its functions satisfactorily) is obliged to furnish all the assistance required, and is under a general duty to make every effort to provide the mission with all facilities for the purpose. It is assumed that requests for assistance will be kept within reasonable limits.[5]

The United States has thus consistently construed its duty to accord "full facilities" to mean ensuring

that the foreign mission can access the type of things that no mission could do without. The United

States has thus asserted in Statements of Interest and briefs that creditors cannot interfere with bank

accounts containing funds used to support a Mission—even if generating interest incidental to their

remaining on deposit, and even if used to acquire supplies.[6] The United States has recognized that, as

set forth in the Vienna Convention's preamble, "the privileges and immunities conveyed by the VCDR

are meant 'to ensure the efficient performance of the functions of diplomatic missions.'"[7] But the

United States has no duty to ensure that a foreign state has enough funding to operate. Nor is there

anything unique about Niger preventing it from being funded in the regular way: by the central

---

[5] Int'l L. Comm'n, Rep. Covering the Work of Its Tenth Session, at 18, U.N. Doc. A/3859 (1958), *available at* https://digitallibrary.un.org/record/714080?ln=en&v=pdf, appended hereto as Appendix 3.

[6] Statement of Interest of the United States of America, at 7, *Wyatt v. Syrian Arab Republic*, 08-CV-502-RCL, 2015, available at https://2009-2017.state.gov/documents/organization/258165.pdf; Brief of the United States of America, at 15 (May 17, 2013), *Thai-Lao Lignite Co. Ltd. v. Government of the People's Republic of Lao*, 13-495, available at https://2009-2017.state.gov/documents/organization/226366.pdf. Both briefs were obtained from the Official Digest of United States Practice in International Law, and are appended hereto as Appendices 4 and 5, respectively.

[7] Appendix 5 at 15.

government, from its capital. Niger concedes that the Mission had been funded centrally and that it was only political circumstances that briefly caused a departure from that norm. Niger has further conceded that its Mission actually does receive funds from its central government now, but that the government has "internal budgetary issues." Dkt. 37 at 2 ("The central government provides additional funds to supplement the rental income."). At most, this is an issue of inefficient governance; redressing it cannot reasonably be part of the United States' duty to provide "full facilities." Thus, Niger does not *need* to fund its Mission from the Property's profits in New York; it continues to rent out the Property on the Upper East Side of Manhattan because it's lucrative.

Article 22 of the Vienna Convention on Diplomatic Relations does not offer any protection from attachment here either. It covenants that "[t]he premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission." This article is about who can come on the property and whether a diplomat can be forcibly removed from it, not whether a foreign state may acquire and rent out various properties in its name to unrelated parties. The case law on this point tracks this distinction. Where a diplomat actively occupied rented premises and the landlord refused to extend the lease, Article 30 of the Vienna Convention— guaranteeing the inviolability of a private residence of diplomats—kicked in to prevent the eviction of attachés occupying premises leased to the Permanent Mission of Pakistan to the United Nations. *York River House v. Pakistan Mission to United Nations*, 820 F. Supp. 760, 762 (S.D.N.Y. 1993) (permitting the landlord to seek damages for violating the lease). But in *TIG Ins. Co. v. Republic of Argentina,* 967 F.3d 778, 780 (D.C. Cir. 2020), it was entirely uncontroversial that a property that had been used to house diplomats, but which was later rented out, was potentially subject to attachment; the only question was whether the property was still generating revenue or was for sale when the petitioner sought to attach it.

6

**C.  Petitioner Requests the Court to Ensure that it is not Prejudiced by the Delay Caused by Awaiting the Views of the Government**

If the Court remains inclined to solicit the views of the United States, delay of at least two months is likely. The Department of Justice will have to coordinate with the Department of State and the Office of Foreign Missions before it is able to file a statement of interest. A lot could happen in that time. In its sur-reply, Niger offered as a hypothetical that it can just sell the Property and put the proceeds into a bank account and fund the Mission that way. Dkt. 37 at 3. Indeed, the prospect of a sale is precisely why Petitioner believes that restraining notices on the Property are necessary. Should the Court proceed to solicit the views of the United States, Petitioner respectfully requests that, prior to doing so, the Court issue an order finding that, pursuant to 28 U.S.C. § 1608(c), a reasonable time has passed since entry of the judgment, and issue a restraining notice pursuant N.Y. C.P.L.R. § 5222 based on a preliminary finding that the Property is not immune from attachment and leave the rental proceeds unencumbered until the United States has signaled whether it will accept the Court's invitation to be heard in this matter. This will protect Petitioner's rights pending ultimate adjudication of whether the Court will order execution.

Dated: July 1, 2026

SEQUOR LAW, P.A.

s/ Tara J. Plochocki
Tara J. Plochocki (NY Bar No. 5359054)
1200 G Street NW
Suite 340
Washington, DC 20005
Telephone: (202) 900-8740
tplochocki@sequorlaw.com

Arnoldo Lacayo (admitted pro hac vice)
1111 Brickell Ave
Suite 1250
Miami, FL 33131
alacayo@sequorlaw.com

*Counsel for Petitioner*