UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MENZIES MIDDLE EAST AND AFRICA SA,

Petitioner/Judgment Creditor,

-v-

REPUBLIC OF NIGER,

Respondent/Judgment Debtor.

---

25-MC-332 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Petitioner Menzies Middle East and Africa SA ("Menzies"), an aviation services firm, moves for a writ of attachment and execution on a building located at 5 East 80th Street, New York, NY (the "Property") owned by Respondent Republic of Niger ("Niger") pursuant to 28 U.S.C. § 1610(c) and a restraining notice prohibiting Niger from transferring the Property pursuant to N.Y. C.P.L.R. ("CPLR") § 5222. Menzies seeks to execute on the property to satisfy an approximately $7 million arbitral award it obtained in 2013, which was subsequently confirmed in a judgment entered by the United States District Court for the District of Columbia (and thereafter registered in this District). *See* ECF No. 6 ("Pet'r TRO Mem."), at 2-3. Niger opposes the motion, arguing that its choice to use the rental proceeds from the Property to fund its diplomatic mission to the United Nations renders the Property immune from attachment or execution. The Court disagrees, as the Property falls squarely within an exception to Niger's immunity from attachment or execution for property that is "used for a commercial activity in the United States." Accordingly, and for the reasons that follow, Menzies's motion for a writ of attachment or execution and a restraining notice is GRANTED.

## BACKGROUND

In 1977, Niger purchased the Property, which is a multi-story mansion currently valued at approximately $35 million. *See* Pet'r TRO Mem. 3. According to the Chargé d'Affaires for the Permanent Mission of the Republic of Niger to the United Nations (the "Mission"), the Property was used as the official residence of Niger's Ambassador to the United Nations until the late 1990s. *See* ECF No. 38 ("Ousman Suppl. Decl."), ¶ 5. But after a financial and diplomatic crisis left Niger's central government unable to reliably wire funds to the Mission, *see id.* ¶ 6, Niger began renting the Property to a series of private tenants and now uses the rental proceeds to fund the operations of the Mission. *See id.* ¶¶ 7, 10. Under the terms of the lease, the tenant sends checks directly to the Mission, which deposits them in a New York bank account and uses the money to pay for the salaries of local staff, supplies, maintenance costs, and "other ordinary expenses of operating and maintaining the mission in New York." *See id.* ¶¶ 9-10. On top of the funds derived from the Property and some consular-service fees, the Mission receives additional funding from the central government of Niger. *See id.* ¶¶ 12-13. The Property is Niger's only known asset in the United States. *See* Pet'r TRO Mem. 3.

The underlying dispute that gave rise to this case dates back to 2004, when Menzies submitted a bid to perform ground-handling services at Niger's airports and was ultimately awarded a ten-year contract. *See Menzies Middle East & Africa SA v. Republic of Niger*, No. 24-CV-0466 (ABJ), 2025 WL 1836023, at *1 (D.D.C. July 3, 2025). Approximately halfway through the contract period, however, Niger issued decrees that effectively abrogated the contract, created a competing ground-handling unit at the country's main airport, and requisitioned Menzies's personnel and equipment without compensation. *See id.* After judicial proceedings in Niger failed to resolve the dispute, Menzies initiated an arbitration before the

International Center for the Settlement of Investment Disputes ("ICSID") pursuant to the terms of its contract with Niger. *See id.* at *2. Niger initially challenged the ICSID's jurisdiction, but it later ceased all involvement in the arbitral proceedings and was declared to be in default. *Id.* On July 15, 2013, the ICSID tribunal issued a final decision, finding that Niger had breached its contract with Menzies and ordered it to pay €4,641,592.15 in damages and €118,000 in defense costs, arbitration costs, and interest (the "Award"). *See id.* at *3.

Menzies then filed suit in the United States District Court of the District of Columbia to confirm the Award. *See id.* at *1. Niger failed to appear in that action and, on July 3, 2025, the Honorable Amy Berman Jackson granted Menzies's motion for default judgment against Niger and confirmed the Award, entering judgment — after conversion of the Award from Euros to dollars — in the amount of $7,603,623.31, not including post-judgment interest. *See id.* at *7. On August 5, 2025, Menzies registered that judgment in this District, and the Clerk of Court issued an abstract of judgment two days later. *See* ECF No. 1. Thereafter, the judgment was also translated and, on August 27, 2025, delivered to Niger's Ministry of Foreign Affairs. *See* ECF No. 22-1 ("Plochocki Decl."), ¶¶ 4, 16.

This action began in earnest months later on February 4, 2026, when Menzies filed a motion seeking: (1) a temporary restraining order ("TRO") that would prevent Niger from disposing of the Property during the pendency of litigation; and (2) a writ of execution on the Property pursuant to 28 U.S.C. § 1610(c). *See* ECF No. 5. After ordering further briefing, *see* ECF No. 20 ("Resp. TRO Opp'n"); ECF No. 22 ("Pet'r Mem."), the Court denied Menzies's request for a TRO, finding that Menzies had failed to establish irreparable harm because it had offered nothing more than speculation that Niger *could* sell the Property on short notice. *See* ECF No. 25. But the Court reserved judgment on Menzies's requests for additional injunctive

relief, including a writ of execution and a restraining notice, pending further briefing. *See id.* The parties have since submitted additional briefs addressing that issue. *See* ECF No. 26 ("Resp. Mem."); ECF No. 29 ("Pet'r Reply"); ECF No. 37 ("Resp. Sur-reply").[1]

**DISCUSSION**

The Foreign Sovereign Immunities Act ("FSIA" or the "Act") states that, "[s]ubject to existing international agreements . . . the property in the United States of a foreign state shall be immune from attachment . . . and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609. Section 1610, in turn, provides what is known as the "commercial activity" exception to that rule. It provides that "property . . . used for a commercial activity in the United States[] shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States[] if," *id.* § 1610(a), *inter alia*, "the judgment is based on an order confirming an arbitral award rendered against the foreign state . . . ." *Id.* § 1610(a)(6). A court, however, may not order any such attachment or execution until it has "determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under [28 U.S.C. § 1608(e)]." *Id.* § 1610(c).

Accordingly, under federal law, to grant Menzies's request for a writ of execution, the Court must find that (1) the Property is not immune from attachment or execution; and (2) the conditions listed in Section 1610(c) have been met. Further, the parties agree that those same

---

[1] Notwithstanding that briefing. Niger asserts that the issue of whether the Court may issue a writ of execution "cannot be resolved on the current record" and that additional briefing "as contemplated" by the Court is required. ECF No. 37 ("Resp.'s Sur-reply"), at 1 n.1. But the Court has received all the briefing — three rounds total — that it contemplated, and Niger does not identify what, if any, additional issues remain unaddressed. Relatedly, the Court had previously suggested that it was inclined to solicit the views of the United States on the issue of whether issuing a writ of execution would be consistent with the treaty obligations of the United States. *See* ECF No. 40. Upon reflection, the Court concludes that it can and should decide the case without soliciting the views of the United States and the delay that would occasion.

findings are required before the Court may grant Menzies's request for a restraining notice pursuant to CPLR § 5222, which "authorizes a judgment creditor to serve a restraining notice against property of a judgment debtor" that "forbid[s] any sale, assignment, transfer or interference with any property in which [the judgment debtor] has an interest." *Berkshire Bank v. Tedschi*, No. 11-CV-0767 (LEK/CFH), 2016 WL 1029526, at *1 n.1 (N.D.N.Y. Mar. 15, 2016) (cleaned up). That is because while "procedure[s] on execution" must typically "accord with the procedure of the state where the court is located," "a federal statute governs to the extent it applies." FED. R. CIV. P. 69(a)(1); *compare* Resp. Mem. 7 ("Without a showing that the statutory (FSIA) and treaty . . . restrictions have been satisfied, a CPLR § 5222 restraining notice cannot issue."), *with* Pet'r Reply 7 (acknowledging that "using state law procedures for attachment in aid of execution" without a "§ 1610(c) order in place" would "contravene[] the FSIA"). Thus, the Court will address each federal requirement in turn.

**A. Immunity from Attachment or Execution**

As noted, the FSIA provides, in relevant part, that a foreign state's "property . . . used for a commercial activity in the United States," 28 U.S.C. § 1610(a), is not immune from attachment or execution of a judgment if that "judgment is based on an order confirming an arbitral award rendered against the foreign state," *id.* § 1610(a)(6). It is undisputed that the approximately $7 million judgment on which Menzies is seeking to execute is based on Judge Jackson's July 3, 2025 Order confirming the ICSID Award against Niger. *See* ECF No. 1.[2] The only question, then, is whether the Property is being "used for a commercial activity." 28 U.S.C. § 1610(a).

---

2 Niger quibbles with the July 3, 2025 Order insofar as it converted the Euro-denominated award into U.S. dollars and it computed the relevant interest rates. *See* ECF No. 20 ("Resp. TRO Opp'n"), at 4-5. But Niger does not dispute that an arbitral award was rendered against it or that the Order on which the judgment is based confirmed the award, which is all that Section 1610(a)(6) of the FSIA requires. To the extent Niger purports that it will seek to amend the

The FSIA defines "commercial activity" as "a regular course of commercial conduct or a particular commercial transaction or act" and states that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d). Applying that definition, the Second Circuit has held that a foreign nation is engaged in commercial activity within the meaning of the FSIA when "the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 258 (2d Cir. 2012) (cleaned up). Put differently, the fact that a particular activity has or might have a "public purpose" — e.g., to "build roads, army barracks," or to "implement a national program of scientific research and development," *id.* (cleaned up) — is irrelevant in determining whether it constitutes commercial activity. All that matters is that, in doing so, the foreign country acts "in the manner of a private actor." *Id.* at 260 (cleaned up); *see also Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992) ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA.").

Measured against these standards, the Court has little difficulty concluding that Niger "use[s]" the Property "for a commercial activity in the United States" within the meaning of Section 1610(a). By leasing the Property to private tenants in exchange for rent payments, Niger acts just as any commercial landlord in the marketplace would. *See, e.g.*, *Joseph v. Off. of*

---

judgment, it could do so through a Rule 60 motion, but such a motion would "not affect the judgment's finality or suspend its operation." FED. R. CIV. PROC. 60(c). Moreover, although Niger represented on May 14, 2026, that it intended to "seek correction of the Judgment . . . within two weeks," ECF No. 26 ("Resp. Mem."), at 5, there is no indication that counsel for Niger has appeared in the D.C. action, let alone filed any Rule 60 motion.

*Consulate General of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987) (holding that Nigeria's rental of a property constituted commercial activity under the FSIA because, in doing so, "the Consulate entered the marketplace as a commercial actor"); *Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 535-36 (S.D.N.Y. 2017) ("The leasing of the [b]uilding by [Defendants] . . . readily meet[s] the FSIA's 'commercial activity' requirement."), *rev'd on other grounds sub nom.*, *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019). Indeed, that type of use seems to be precisely what Congress had in mind when it drafted the commercial activity exception. *See* H.R. REP. NO. 94-1487, at 16 (1976) ("[A] foreign government's . . . leasing of property . . . would be among those included within the definition [of commercial activity].").

Niger's counterarguments are without merit. First, relying principally on *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002), Niger maintains that the Property is immune from execution because the rental proceeds it produces are "being used to maintain Niger's diplomatic presence in New York." Resp. Mem. 4. In *Connecticut Bank*, the Fifth Circuit held that royalties and taxes owed to the Republic of Congo and held by third parties could not be attached under the FSIA unless the funds themselves — as opposed to the property that generated the funds — were "used for a commercial activity in the United States." *See* 309 F.3d at 251-61. As the court explained,

> What matters under the statute is what the property is "used for," not how it was generated or produced. If property in the United States is used for a commercial purpose here, that property is subject to attachment and execution even if it was purchased with tax revenues or some other noncommercial source of government income. Conversely, even if a foreign state's property has been generated by commercial activity in the United States, that property is not thereby subject to execution or attachment if it is not "used for" a commercial activity within our borders. The district court (and the litigants) have focused on the question of whether the Congo's joint venture with the garnishees, which gave rise to the royalty and tax obligations that the Bank wants to garnish, was a "commercial activity in the United States." This was the wrong question to consider. What matters under the statute is not how the Congo made its money, but how it spends

> it. The amenability of these royalties and taxes to garnishment depends on what they are "used for," not on how they were raised.

*Id.* at 251; *see also Export-Import Bank of the Republic of China v. Grenada*, 768 F.3d 75, 89-91 (2d Cir. 2014) (following *Connecticut Bank* and holding that fees owed to Grenadan corporations were immune from attachment under the FSIA on the ground that the fees were devoted to "carrying out public functions in Grenada" and "used for the maintenance of facilities and services in Grenada"). That holding might pose an obstacle to Menzies if it were seeking to attach a pot of money previously "generated or produced" by the Property. *Connecticut Bank*, 309 F.3d at 251. But Menzies seeks to attach the Property itself, which, as discussed, "is used for a commercial purpose here." *Id.* Far from aiding Niger, therefore, *Connecticut Bank* actually confirms that the Property "is subject to attachment and execution." *Id.*

Trying a different tack, Niger next invokes as a source of immunity Article 25 of the 1961 Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 (the "Vienna Convention"). That argument is premised on Section 1609 of the FSIA — enacted in 1976 — which provides that the Act's immunities and exceptions are "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of [the FSIA]." 28 U.S.C. § 1609. In light of this provision, the Second Circuit has explained, "the diplomatic and consular immunities of foreign states recognized under various treaties," including the Vienna Convention, "remain unaltered by the [FSIA]." *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 297 (2d Cir. 1993). Thus, if property is immune from execution or attachment under the Vienna Convention, it is also exempt under the FSIA "regardless of how it would be treated under sections 1610 and 1611" of the Act. *Wyatt v. Syrian Arab Republic*, 83 F. Supp. 3d 192, 195 (D.D.C. 2015). Niger contends that the Property

is immune from execution or attachment under Article 25 — which obligates the United States to "accord full facilities for the performance of the functions" of foreign diplomatic missions, Vienna Convention, art. 25, 23 U.S.T. at 3238— because the rental income from the Property is needed to fund the operations of the Mission. *See* Resp. Mem. 3-4.

It is true, as Niger notes, *see* Resp. Mem. 4, that courts have denied requests to attach embassy bank accounts on the ground that such attachment would run afoul of Article 25. *See, e.g.*, *Liberian E. Timber Corp. v. Gov't of Republic of Liberia*, 659 F. Supp. 606, 610-11 (D.D.C. 1987); *Wyatt*, 83 F. Supp. 3d at 195-96; *Foxworth v. Permanent Mission of Republic of Uganda to United Nations*, 796 F. Supp. 761, 763 (S.D.N.Y. 1992). But in each of these cases, seizure of the embassy bank account would have "force[d] [the mission] to cease operations" because an embassy cannot function without a bank account through which it can send and receive money. *Foxworth*, 796 F. Supp. at 763. By contrast, there is nothing to stop Niger from operating the Mission without the Property's rental proceeds by funding it entirely from the Nigerien treasury. That is confirmed by the fact that Niger provides at least some of the funding for the Mission from its central government. *See* Ousman Suppl. Decl. ¶¶ 10, 12. And Niger's self-serving assertion that "[t]he Mission would be unable to survive" without the Property, Ousman Suppl. Decl. ¶ 15, is belied by the fact that the Property has been the subject of an order of execution before and there is no indication that it impeded the functioning of the Mission. *See, e.g.*, *Africard Co. v. Republic of Niger*, No. 16-MC-370 (S.D.N.Y. Jan. 17, 2017), ECF No. 28 (issuing a writ of execution against the Property).[3] Niger does not cite — and the Court has not

[3] Thus, the Court need not and does not resolve the dispute between the parties as to whether Menzies's analysis of Nigerien law to establish the source of the Mission's funding was proper under Rule 44.1 of the Federal Rules of Civil Procedure because that analysis is irrelevant to the Court's decision. *Compare* ECF No. 29 ("Pet'r Reply"), at 3-4, *with* ECF No. 30, at 2-3.

found — any case construing Article 25 so broadly as to immunize *all* revenue-generating properties owned by a foreign nation from attachment or execution, so long as the nation elects to use some of the revenue to fund that nation's diplomatic activities in the United States. That is unsurprising because holding as much would permit a foreign nation to evade the FSIA's commercial activity exception merely by directing some of the proceeds of commercial activity in the United States to support its diplomatic mission in the United States.

Niger also cites *767 Third Avenue* and *Bennett v. Islamic Republic of Iran*, 618 F.3d 19 (D.C. Cir. 2010), in support of its position, but neither of these cases is relevant here. *See* Resp. Mem. 4-5. In *767 Third Avenue,* the Second Circuit reversed an order that had evicted the Republic of Zaire's Mission to the United Nations from a private building on the ground that such an eviction would violate Article 22 of the Vienna Convention, which declares that "[t]he premises of [a foreign country's] mission shall be inviolable" and immune from "search, requisition, attachment or execution." 988 F.2d at 298 (quoting Vienna Convention, art. 22, 23 U.S.T. at 3238). But Niger does not, and could not, argue that the Property in this case constitutes part of the "premises of [its] mission," so Article 22 is inapposite. Meanwhile, *Bennett* involved an entirely different statute — the Terrorism Risk Insurance Act — that exempts from attachment certain properties "used exclusively for diplomatic or consular purposes." 618 F.3d at 21. But the Property itself is not used for diplomatic or consular purposes. And in any event, the scope of the commercial activity exception in the FSIA does not turn on the purposes for which the property is used. *See Weltover*, 504 U.S. at 614.[4]

[4] In a sur-reply, Niger cites a few additional cases in which courts invoked Article 22 and Article 30 — which protects the private residences of diplomats — to stop the eviction of embassy staff from leased properties. *See* Resp.'s Sur-reply 3. But the Court need not and does not consider that portion of Niger's sur-reply because it does not purport to address any arguments raised for the first time in Menzies's reply brief, and Niger provides no reason for its

In sum, the Property is not immune from attachment or execution.

**B. Section 1610(c) Requirements**

Before the Court can issue a writ of execution on the Property, however, it must also find that (1) a reasonable period of time has elapsed since entry of the judgment; and (2) that notice was provided as required under section 1608(e) of the Act. *See* 28 U.S.C. § 1610(c). Each requirement is easily met here. As to the first, the FSIA does not specify what constitutes "a reasonable period of time," but most courts have held that two to three months are sufficient. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, No. 10-CV-4518 (KBF), 2013 WL 1155576, at *35 (S.D.N.Y. Mar. 13, 2013) (100 days); *Gadsby & Hannah v. Socialist Republic of Romania*, 698 F. Supp. 483, 486 (S.D.N.Y. 1988) (two months); *Ferrostaal Metals v. S.S. Lash Pacifico*, 652 F. Supp. 420, 423 (S.D.N.Y. 1987) (three months). Here, the relevant judgment was entered against Niger on July 3, 2025, over a full year ago, which is plainly sufficient. As to the second requirement, Section 1608(e) requires that "[a] copy of any . . . default judgment shall be sent to the foreign state . . . in the manner prescribed for service in this section." 28 U.S.C. § 1608(e). Section 1608(a), in turn, provides that service may be made upon a foreign state by, *inter alia*, "sending a copy . . . together with a translation . . . into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). Niger was served with a copy and translation of the default judgment in precisely

---

failure to cite the cases in its opposition brief. *See Duraku v. Tishman Speyer Props., Inc.*, 714 F. Supp. 2d 470, 474 (S.D.N.Y. 2010) (disregarding an argument made for the first time in a sur-reply). In any event, Niger's belatedly cited cases do not help its cause for the same reasons discussed above: Niger does not, and cannot, argue that the Property constitutes "premises of the mission" within the meaning of Articles 22 and 30.

this manner on August 27, 2025, and it does not dispute that this service was proper. *See* Plochocki Decl. ¶¶ 4, 16.[5] Accordingly, the requirements of Section 1610(c) are met.

## CONCLUSION

For the foregoing reasons, Menzies's motion for a writ of execution and restraining notice on the Property is GRANTED. Menzies shall promptly confer with Niger and, **within one week from the date of this Opinion and Order**, file a proposed writ of execution and restraining notice for the Court to endorse.

SO ORDERED.

Dated: July 28, 2026
New York, New York

JESSE M. FURMAN
United States District Judge

[5] Niger did initially argue that Menzies failed to provide "proof that service was completed in accordance with the statutory requirements." Resp. TRO Opp'n 4. But the FSIA does not expressly require proof of service, and, in any case, Menzies has since provided it. *See* ECF No. 22-1 ("Plochocki Decl.").